HARRY M. VEIX, PLAINTIFF, v. SENECA BUILDING AND LOAN ASSOCIATION OF NEWARK, A CORPORATION OF THE STATE OF NEW JERSEY, DEFENDANT.

Decided April 17, 1940.

For the plaintiff, *Walter P. Reilly*.

For the defendant, *Francis P. Meehan*.

SMITH, JOSEPH L., S. C. C.  This comes on defendant's application for an order to reargue the motion filed by the plaintiff to strike the answer of the defendant, the application having been made upon the ground that the opinion of this court heretofore rendered on the 21st day of December, 1939, is contrary to law.  The gist of defendant's argument is that the observations made by this court in its said opinion, to the effect that the prepaid shareholder such as the plaintiff in the present case, does not enjoy equality and mutuality with other shareholders, and that therefore, application of chapter 102, laws of 1932, and amendments, to prepaid shareholders, would be unconstitutional, is contrary to law; that the prepaid shareholder stands on the same footing and on terms of equality and mutuality with other shareholders, and further, that the constitutionality of the legislation in question, the laws of 1932, chapter 102, in so far as it applies to prepaid shares, has been passed upon and sustained by our

Court of Errors and Appeals in the cases of *Rocker* v. *Cardinal Building and Loan Association,* 119 *N. J. L.* 134, and *Veix* v. *Sixth Ward Building and Loan Association,* 123 *Id.* 356.

In observing the distinction between prepaid shareholders and holders of other types of shares, we are not attempting to define relative rights and positions of the various types of shareholders, and it will serve no useful purpose, so far as the present problem is concerned, to deny or assert that prepaid shareholders are creditors, or preferred shareholders, or even that their position is inferior to the position of other shareholders. We note the distinction only as it becomes relevant to the question of the constitutionality of the act under discussion, following the rationale of the opinion given in the case of *Bucsi* v. *Longworth Building and Loan Association,* 119 *N. J. L.* 120.

Under the principle of that case the findings that building and loan associations are affected with public interest, and that the legislation in question was "for an end that is, in fact, public" were not considered the full and complete justification for the statute which concededly abrogates contractual rights. The Court of Errors and Appeals in the *Bucsi* case, *supra,* considered the element of public interest as justification for the exercise of police power, but further than this, it recognized the need for fairness and reasonableness in the exercise of that power; adopting the language of Mr. Justice Roberts, in the case of *Treigle* v. *Acme Homestead Association,* 297 *U. S.* 189, 197; 80 *L. Ed.* 575; 56 *Sup. Ct. Rep.* 408 (at *p.* 126 of 119 *N. J. L.*) (italics ours) :

"Though the obligations of contracts must yield to a proper exercise of the police power (*Home Building and Loan Association* v. *Blaisdell,* 290 *U. S.* 398; 78 *L. Ed.* 415; 54 *Sup. Ct. Rep.* 531), and vested rights cannot inhibit the proper exercise of police power (*Nebbia* v. *New York,* 291 *U. S.* 502; 78 *L. Ed.* 940; 54 *Sup. Ct. Rep.* 505), it must be exercised for an end which is in fact public and the means adopted must be *reasonably adapted* to the accomplishment of that end and *must not be arbitrary or oppressive.*

And then again (at *p.* 130), the court stated that obliga-

tion on contracts must yield to a proper exercise of the police power. It is obvious then, that the existence of public interest, did not, in and of itself, justify any and all legislative abrogation of contractual rights. Such legislation in order to be valid, must not only have for its purpose the safeguarding of public interest, but must accomplish that purpose by proper, fair and reasonable means. The court, in the Bucsi case, found the fulfillment of this second requirement in the effect of the statute to promote and continue an already existing plan or scheme of equal participation of mutuality between shareholders. Thus, on page 125 of the opinion, the court says:

"But the statutory right of a member to withdraw from membership and to receive the withdrawal value of his shares and the statutory privilege to sue for the amount if not paid within the time named in the statute, is based upon and forms a part of the general plan that *each member is entitled to equal participation in the assets,* and the statute does not contemplate that the privileges named shall be exercised to defeat equal participation, but that the spirit of the statute being equal participation, the paramount equity is equal participation at all times." (Italics ours.)

Undoubtedly, when building and loan associations first came into being, mutuality and equality in participation of profits was not only the paramount but the necessary feature of these institutions and in the absence of statutory authority the power to issue prepaid shares was disputed as contrary to the central idea of mutuality and equality. The statutory authority granted to these associations to issue prepaid shares makes these prepaid shares legal, but does not put them on a basis of mutuality and equality. Originally, building and loan associations were not intended to be investment companies; they were not meant as depositaries for large investments; they were planned to permit wage earners to put their small savings there, to co-operate in the investment and to share equally in the assets, profits and losses. We note that in the earlier instances permitting the issuance of prepaid shares, these shares kept the feature of equality and mutuality. Thus, in *People, ex rel. Fairchild* v. *Preston*

(*N. Y.*), 35 *N. E. Rep.* 979, the court, sustaining the validity of fully paid shares observes (italics ours) :

"The certificate provides that 'upon prepaid stock there shall be paid at the time of the subscription, dues to the amount of $60, and the holder thereof shall be entitled to receive, out of the profits apportioned thereto, semi-annual dividends in cash, up to the rate of six per cent. *per annum; the profits apportioned to such stock, over and above such dividends, shall be credited thereto and payable with the stock at its maturity.'* It does not prevent or defeat equality or mutuality among the members."

Thus, prepaid shares as originally permitted, had their participation in all profits. Under the terms of the certificate in the present case, the holder of a prepaid share was limited once and for all, to his six per cent. *interest,* and to the withdrawal of the par value, irrespective of any increase in assets or profits made by the company to the benefit of other shareholders.

We observe this, not to dispute the legality of prepaid shares but to note that to the extent that prepaid shares of the type involved in the present case, were permitted, deviation was made from the original idea of equality and mutuality.

We cannot ignore or avoid this diversity of interest among the shareholders during the solvency and operation of an association by pointing to decisions and statutes which imposed an equal standing as to losses and debts in the event of insolvency. It was pointed out that under the laws of 1925, chapter 65, it was provided that "all members shall occupy the same relative status as to debts and losses of such association." This, obviously, does not give an equal participation in the assets and profits; it contemplates assumption of losses in the event of insolvency and liquidation.

This diversity of rights between prepaid shareholders and others was noted by Vice-Chancellor Stein in *Newark 21 Building and Loan Association* v. *Zuckerberg,* 115 *N. J. Eq.* 579. In that case, the defendant, the mortgagor, holding installment shares in the complainant company, the mortgagee, demanded that in ascertaining the credit to be given

upon her shares, toward the payment *pro tanto,* of the mortgage, the losses be assessed as against all members of the association including the prepaid shareholders. Vice-Chancellor Stein, recognizing the difference in status between the prepaid shareholders and others said (at *p.* 582), (italics ours) :

"I. The prepaid shareholders paid full value for their shares and *were not given the right to participate in the profits of the association derived from premiums, fines, withdrawal penalties and interest on the association's investments.* The association agreed to pay such shareholders a fixed dividend in lieu of participation in the general profits of the association.

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

"The certificate issued by the association to its prepaid shareholders provides that such shares shall bear interest at five per cent., and may be called in and canceled at any time upon notice and payment of the par value and interest to the date of cancellation, and that beyond the payment of five per cent. interest such shareholders 'shall not further participate in the general earnings of the association.'

"*The installment stockholders enjoy many possible advantages which are denied to the prepaid shareholders.* They participate in all of the profits of the association and this expedites the maturity of their stock and profitable winding up of their financial venture. The profits on their investment depend upon the time the association runs, while the holders of paid-up shares obtain their profits in stipulated interest as the time proceeds. In both instances it is a case of profit upon money invested in the stock of the association—the common fund which constitutes the capital of the association. They constitute, therefore, simply a different class of stockholders. *Latimer* v. *Equitable Loan and Investment Co.,* 81 *Fed. Rep.* 776; *Towle* v. *American Building and Loan Association,* 75 *Fed. Rep.* 938. That paid up shareholders are a different kind of shareholder from that of the installment shareholder clearly appears in section 74 of the act of 1925, chapter 65, 'that no member shall hold paid-up shares in any such association of a value in excess of two *percentum*

of the liability of such association for dues on installment shares, and in no case shall a member hold paid-up shares in any such association of a value in excess of twenty-five thousand dollars.' From this limitation, however, are accepted 'paid-up shares that received by a person by will or under the statute of distribution, or held as collateral security.' No such limitation is imposed upon installment shareholders.

"The complainant association in the instant case, by authority of the statute and under its constitution, entered into agreement with its paid-up shareholders whereby these members *waived participation in the general profits of the association in consideration of the payment of interest at the rate of five percentum per annum. They had no interest in the profits set up on the books which were transferred to the reserve account.*

"Much stress was laid in support of the proposition that prepaid shareholders should contribute *pro rata* by way of an assessment or by withholding future dividends or interest, toward the reserves required by the department because of that portion of section 74 which provides that '*all members shall occupy the same relative status as to debts and losses of such association.' I cannot construe this language to mean that losses should be borne proportionately out of profits in the case of installment shareholders and out of capital in the case of prepaid shareholders. The language of the section can only have application in case the capital is impaired and the association is insolvent for there are no losses to which the prepaid shareholder can be held to contribute until all the profits are dissipated.*"

The diversity of interest, and inequality in participation between prepaid shareholders and others, during the operation of a solvent company were neither disputed nor passed upon in the cases of *Fitzgerald* v. *State Mutual Building and Loan Association,* 76 *N. J. Eq.* 137, and *Moore* v. *Conover,* 123 *Id.* 61. In the Fitzgerald case, the holder of full paid stock claimed the status of a creditor, and a preference in the distribution of the assets of the company in liquidation because of insolvency. Such preference was denied. Likewise, in the Moore case, the court denied the status of a bondholder

to a full paid shareholder of an insolvent company taken over by the Department of Banking and Insurance. Whether we designate or refuse to designate a prepaid shareholder as a creditor, preferred shareholder, or for that matter, an inferior shareholder or by any other given name, the fact remains that during the solvent operation of a company, he is not on a basis of equality and mutuality, and the effect of the statute in question is not to promote, as to him, such an equality.

What then, was the effect of the statute on the rights of the prepaid shareholder? That a radical change has been effected in the rights and privileges of all withdrawing shareholders was stated in the Bucsi case, *supra* (see page 126 of Report) but more than that, and peculiar to the holder of prepaid shares, the effect of the statute is to deprive him of his limited contractual rights, without, at the same time, granting him mutuality and equality with the other shareholders in the participation in profits, or in benefits that are expected to result to the association as a whole, by the operation of the act, by conservation of the assets of the association.

It appears then, that the prepaid shareholder, lacking the equality and mutuality with others, in the participation in profits, and being denied such equality and mutuality in the benefits to be derived under the act, the effect of the statute is not to continue an existing equal participation, or to promote such equality; therefore, under the very principle of the Bucsi case, so far as prepaid shareholders are concerned, the statute in question does not evince a proper, fair and reasonable exercise of police power.

In connection with the above observations, it will be profitable to refer to the case of *Cohen* v. *Swink*, 3 *S. E. Rep.* (2d) 471, a decision of the Supreme Court of Appeals of Virginia, rendered June 12th, 1939. The case is not completely analagous with the present situation, and is not cited as authority to be necessarily relied upon, but rather for observations made therein which are worthy of note. The gist of the holding is, that a prepaid shareholder, having sacrificed his rights to a proportionate share of the income and having been confined to a specified rate of interest and a guaranty of the payment of that sum, stands upon a different footing from

the rest of the shareholders, and is in the position of, as the court designates, a *quasi*-creditor. The suit in the said case was in equity, to distribute the assets of an insolvent building and loan association. Plaintiff was the holder of certain full paid certificates and claimed preference in payment. There were no outside creditors so that the dispute was between the shareholders of the company as to preference, if any. As stated above, the case is not cited as authority for the contention that in the distribution of the assets of an insolvent company, prepaid shareholders in New Jersey are entitled to preference. That it *dehors* the issue. The important point is the reasoning and the logic in the differentiation.

The Virginia court, in the Cohen case, *supra,* discusses at length the history of the company and its endeavors to weather the depression era by various schemes. It appears that originally the association was a typical building and loan association, established on the basis of mutuality and equality. Then the company became more or less of an investment house, with people investing large sums for a definite rate of interest, with the right of withdrawal on thirty days' notice. The company found it profitable to use these moneys in its business and divided the proceeds among those shareholders who had an equality basis. Finding the going hard, during the depression, it solicited among its certified holders to convert their certificates to a new issue, whereby they would give up their definite rate of interest and share in the profits equally. The great majority of the shareholders converted theirs to the new type. The plaintiff held on to the old certificates. It appears then that here it was the old type of shareholder in the company that had a definite rate of interest and the holders of the new shares participated equally in its profits. While it was fair weather for building and loan associations to earn large yields upon their investment, these new shareholders received the benefits, and when the company went on the rocks, they expected the old shares to take the losses equally with them, although deprived of equality in profits previously.

Referring to the holders of the old certificates, the court (at *p.* 473), says: "They were investors, and were, in turn,

perhaps *quasi*-creditors." And referring to the so-called dividends which were paid these investors, the court states that they are misnamed dividends, but were in fact, interest.

It further appears that in 1932 the legislature in Virginia enacted a Building and Loan act which provided among other things, that where, in an emergency, payment of withdrawals of shares in the usual course, were prevented, the shareholders would not be creditors. The act was passed after plaintiff had acquired her old type certificates.

On page 475, the Virginia court said:

"We do not perceive that it is necessary for us to determine whether or not the appellants were creditors and, if so, were they such *ab initio,* or *quasi*-creditors after the maturity of their withdrawal notices, during the solvency of the association, or were members of the association, or stockholders of different classes."

And again, on page 476, the court states:

"About ninety per cent. of the holders of certificates carrying absolute and vested rights were exchanged for a new species of security which clothed the association with advantages and control which had not theretofore existed. This placed, of course, the holders of the 'new certificates' in a different class and relation from that which they had previously occupied. In their old status they could only derive a profit of six per cent. In their new, they stood to enjoy such profits as would be earned by the association, however large they might be. This they evidently evaluated as a substantial consideration. They now contend, through the receiver, that they are entitled to share equally with the holders of the certificates of the character of those which they traded away."

It further appears that in the lower court, the Chancellor, attempting to effectuate the doctrine of equality and mutuality, had given to holders of the old certificates, the same standing as the holders of the new certificates, in the division of the assets of the insolvent company. Criticising this, the appellate court, on page 476 states:

"The learned Chancellor, for whose judgment we have great respect, overruled the report of the commissioner and

held that when insolvency overtakes the company the rights of the members and stockholders must be governed by the 'supreme rule of equality and mutuality.' This is undoubtedly the case as among the holders of the 'new certificates,' but their contracts are not now at all identical with those of the holders of the 'old certificates,' among whom is the appellant, Mrs. Lena Cohen. *When the differences in their contractual relations are noted, the application of the 'supreme rule of equality and mutuality' would be abortive of the principle and it would be destructive of itself. Equality, as equity perceives it, cannot be had by taking the rights which one has, for the benefit of another who is not entitled to enjoy them. Equality without justice is non-existent.*" (Italics ours.)

And finally, at page 478, the Virginia court said:

"One who purchases from a building and loan association 'fully paid stock,' upon which he is to receive a 'guaranteed dividend' at a named rate per cent., payable at fixed times, and who is not entitled to 'participate in further profits,' is, though his right to demand payment is not to become absolute until he shall, after the expiration of a stated period, have given a specified notice, nor until there shall be in the treasury of the association a sufficiency of assets derivable from a designated source to pay him in full, in all substantial respects a creditor of the association, and entitled to be dealt with as such in an equitable distribution of its assets; and this is so, without regard to the above-mentioned conditions as to payment, if such distribution be brought about without fault on the part of the holder of such 'stock.' "

Accordingly, the terminology by which we designated the various types of shareholders is abortive. We cannot ignore their difference in rights, and an absolute unconditional application of equality would be, as the Virginia courts said, equality without justice, an equality achieved by taking the rights of one for the benefit of another.

As to the further point raised that the plaintiff in the present case is bound by the amendments of the constitution of the association, pursuant to the 1932 act, it will be noted that the plaintiff had given his notice of withdrawal on April 19th, 1932, and the laws of 1932, chapter 102, did not

become effective until thereafter, to wit., April 22d, 1932. An amendment of the constitution of the defendant company, could not deprive the plaintiff of his vested rights.

In *Sautter* v. *Supreme Conclave Improved Order of Heptasophs (Court of Errors and Appeals)*, 76 *N. J. L.* 763, Mr. Justice Voorhees said (at *p.* 767):

"* * * It is very generally, if not universally held that these benefit certificates, like other contracts, confer a vested interest upon the member which may not be impaired by a subsequent amendment, even though the power to amend be reserved in general terms. If the member's stipulation to comply with all by-laws thereafter enacted could be construed to relate to a by-law that reduced the benefit from $5,000 to $2,000, it must also relate to a by-law canceling the benefit certificate entirely, a result wholly unjust and absurd. This stipulation must be construed as referring only to reasonable by-laws and amendments adopted in furtherance of the contract, and not to such as would overthrow it or materially alter its terms."

And in *Coghlan* v. *Improved Order of Heptasophs (Supreme Court)*, 86 *N. J. L.* 41, Mr. Justice Trenchard said (at *p.* 47):

"* * * The rule is established in this state that an agreement by an applicant, to be bound by after-enacted by-laws refers only to such by-laws as tend to further the subsistence of the contract between the association and the member, and not such by-laws as defeat or impair the contract. *O'Neil* v. *Supreme Conclave, supra; Poole* v. *Supreme Circle,* 85 *Atl. Rep.* 821; *affirmed,* 80 *N. J. Eq.* 259."

This rule in New Jersey is applied in various states in respect to building and loan certificates.

In *Interstate Building and Loan Association* v. *Wooten,* 113 *Ga.* 247; 38 *S. E. Rep.* 738 *(Georgia,* 1901), the court held (at *p.* 741):

"* * * Where one, on joining a building and loan association, voluntarily consents that it may subsequently alter, amend, or repeal then existing by-laws in so far as they relate to the plan upon which its business shall be transacted * * *

his privilege of withdrawing therefrom upon those terms would immediately become a vested right, which could not be defeated by its tardily undertaking, by means of a change subsequently effected in its by-laws, to recall the offer thus voluntarily made by it. What has just been said is to be understood as applying to such stockholders only as are commonly known as 'non-borrowers' or 'investors.' * * *"

See, also, *Latimer* v. *Investment Co., 81 Fed. Rep.* 77, and *Kelly* v. *Republic Building and Loan Association, 34 S. W. Rep.* (2d) 924.

It is stated that the issue herein raised has already been passed upon by our Court of Errors and Appeals, in the case of *Rocker* v. *Cardinal Building and Loan Association, supra,* and *Veix* v. *Sixth Ward Building and Loan Association,* 123 *N. J. L.* 356; 8 *Atl. Rep.* (2d) 350.

The facts of the Rocker case are more fully set forth in the report in 13 *N. J. Mis. R.* 397, and from this it appears that the certificate issued to the plaintiff in that case, did not materially affect the holder's rights to equal participation in profits and assets; it did not violate or deviate from that principle of equality and mutuality, the continuance and promotion of which was considered to be the justification of the act of 1932. The terms of the certificate in the Rocker case, as stated in the opinion of Judge Cleary, on page 398 of 13 *N. J. Mis. R.,* show that the plaintiff received "profits" and not "interest," as in the present case, and that he expressly waived profits over and above six per cent., in return for a guaranty of such profits; and that he was entitled to "maturity value" of the shares, as against the "face or par value," in the present case. So that, as to the type of the certificates involved, in the Rocker case, it may very well be said that the effect of the laws of 1932, chapter 102, was to continue and promote the principle of equality and mutuality.

As to the case of *Veix* v. *Sixth Ward Building and Loan Association, supra,* reported November 18th, 1939, after the briefs in the present case were submitted, this court has examined the pleadings, as well as the briefs submitted in that case, and it appears that the point now made, namely: the

failure of the 1932 act to have the effect of promoting or continuing any equality or mutuality, so far as prepaid shares are concerned (and therefore, under the reasoning of the Bucsi case, *supra,* the unconstitutionality of the act, so far as prepaid shares are concerned) was never raised. The plaintiff, in the Sixth Ward case, *supra,* argued that the act was unconstitutional as to all types of shares, basing his argument mainly upon the decision in the case of *Triegle* v. *Acme Homestead Association, supra.* However, since that decision had previously been considered by our Court of Errors and Appeals, in the Bucsi case, *supra,* the plaintiff's arguments in the Sixth Ward case naturally were held untenable. In the Sixth Ward case, the plaintiff sought to overrule the Bucsi case decision, whereas, in the present case, this court, accepting the rule of the Bucsi case, applied its reasoning to the particular facts herein involved and held the 1932 act unconstitutional, so far as prepaid shares are concerned. It appears then that the issue raised in the present case was not passed upon by our Court of Errors and Appeals in either of the two cases above mentioned.

For these reasons, the decision of the court hereinbefore made, will stand unchanged.